IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| WILLIAM DUANE LEWTON, personally and as father and next friend of E.L., a minor child, ADRIAN STANG JENNIFER HOLTBERG, ROB FORMANEK, RITA WATSON, and TAMMY JONES, | ) ) ) ) ) ) ) | CASE NO. 8:09CV02 |
| Plaintiffs, | ) ) | **REPLY BRIEF IN SUPPORT OF** |
| vs. | ) ) | **MOTION FOR SUMMARY JUDGMENT FILED BY DEFENDANTS WILLIAM** |
| DIANNA DIVINGNZZO, SAM M. DIVINGNZZO, WILLIAM BIANCO, CHRISTOPHER PERRONE, and BIANCO, PERRONE & STROH, LLC, Defendants. | ) ) ) ) ) ) ) | **BIANCO, CHRISTOPHER PERRONE AND BIANCO, PERRONE & STROH** |

I.    **INTRODUCTION**

In accordance with Local Rule 7.0.1(c), Defendants William Bianco ("Bianco"), Christopher Perrone ("Perrone") and Bianco, Perrone & Stroh, LLC ("Law Firm") submit this reply brief in support of the motion for summary judgment previously filed by Defendants Bianco, Perrone and the Law Firm on December 10, 2010.  In their Brief in Opposition to Defendants' motion for summary judgment, Plaintiffs William Lewton, Adrian Stang, Jennifer Holtberg, Rob Formanek, Rita Watson and Tammy Jones (collectively, "Plaintiffs") failed to respond to the statement of undisputed material facts set forth in Defendants' initial brief.  Pursuant to Local Rule 56.1(b)(1), all facts set forth in Defendants' statement should therefore be deemed admitted by Plaintiffs.

Plaintiffs also failed to respond to several arguments raised in Defendants' initial brief, including (1) that Bianco is not liable on Plaintiffs' claims because he was required by Nebraska rules of discovery and professional responsibility to disclose the recordings

at issue to the Court and other parties in the litigation; and (2) that all claims by Plaintiffs Jones, Stang and Watson fail as a matter of law because those Plaintiffs had no reasonable expectation of privacy in any recorded communications.  Plaintiffs also failed to rebut other points raised in Defendants' initial brief.  Accordingly, for the reasons set forth below and in Defendants' initial brief, Defendants submit that this Court should grant summary judgment to Defendants Bianco, Perrone and the Law Firm on all claims alleged by all Plaintiffs.   Because the Law Firm's liability, if any, is purely vicarious, the Law Firm is also entitled to summary judgment on any claims dismissed as against Bianco and Perrone.

## II.    RESPONSE TO PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS

Defendants Bianco, Perrone and the Law Firm submit the following response to the statement of material facts set forth in Plaintiffs' Brief in Opposition to Defendants' Motion for Summary Judgment:

1.    Defendants admit that Plaintiff Lewton and Defendant Dianna Divingnzzo ("Dianna") are the parents of a daughter, E.L., and that Dianna was originally awarded sole care of E.L. under the parties' divorce decree while Plaintiff Lewton was awarded visitation rights.  Defendants admit that on or about October 12, 2007, Plaintiff Lewton filed an Amended Complaint to modify the original decree and obtain full custody of E.L.

2.    Defendants admit that Plaintiff Lewton was to begin unsupervised parenting time with E.L. in January 2008.  With regard to the remaining facts in Plaintiffs' paragraph 2, Defendants state as follows:

a. Defendants admit that C.G. Jolly stated in his affidavit that in late December 2007 or early January 2008, Dianna personally told Plaintiff Lewton, and her

counsel communicated to Jolly, that E.L. was insecure without Little Bear and needed to take Little Bear everywhere.

3. Defendants admit that Dianna recorded communications by the various Plaintiffs through the use of a recording device placed inside E.L.'s toy, Little Bear. In further response to Plaintiffs' paragraph 3, Defendants state as follows:

a. Dianna testified during her deposition that Plaintiff Lewton physically, verbally and mentally abused her throughout their relationship. (See Exhibit 203, Dianna Depo., 27:20-28:12, 29:3-13). During the course of the parties' relationship, Plaintiff Lewton attended anger management counseling and Dianna accompanied him to those sessions at the request of his doctor. (Id. at 26:15-27:19). Dianna also testified that Plaintiff Lewton was verbally abusive toward and, neglectful, of E.L. during the marriage. (Id. at p. 31:12-25, p. 32-33). Plaintiffs did not dispute these facts, which were set forth in paragraph 2 of Defendants' initial statement of facts.

b. One of the main disputed issues in the custody proceeding was whether Plaintiff Lewton could provide appropriate parenting for the couple's child, E.L. (Bianco Aff. ¶5). Dianna alleged that Plaintiff Lewton had a history of drug and alcohol misuse and that he abused E.L. (Id.). During the course of his representation of Dianna, Bianco discovered that Plaintiff Lewton had a criminal record and a history of drug and alcohol misuse. (Id.). Plaintiffs did not dispute these facts, which were set forth in paragraphs 9 and 14 of Defendants' initial statement of facts.

c. In the early 1990's, Plaintiff Lewton was twice convicted of driving under the influence of alcohol, within a month and a half time span. (See Exhibit 207, Lewton Depo. at 28:1-29:4). At the time of the second offense, he was also charged with

operating the vehicle with a revoked license and while in possession of drug paraphernalia. (Id. at 118:5-16). Plaintiff Lewton spent sixty days in jail as a result of his second DUI conviction. (Id. at 28:15-29:7). In 1999, Plaintiff Lewton was again charged with operating a vehicle while under revocation or suspension. (Id. at 121:19-22). In 2002, Plaintiff Lewton received a third charge of DUI, but the charge was ultimately reduced to reckless driving. (Id. at 30:4-15). However, Plaintiff Lewton spent a night in jail in Ainsworth, Nebraska, as a result of the 2002 driving offense. (Id. at 30:4-15, 42:25-43:12). Plaintiffs did not dispute these facts, which were set forth in paragraph 4 of Defendants' initial statement of facts.

      d. In addition to those driving offenses, Plaintiff Lewton was charged with being a minor in possession of alcohol in 1991. (Id. at 117:3-9). Plaintiff Lewton was charged with trespass in June 1991. (Id. at 117:18-118:1). He received a drug paraphernalia charge in 1992. (Id. at 118:2-4). Plaintiff Lewton has also been charged with obstruction of justice and with an assault and battery charge that was reduced to disturbing the peace. (Id. at 118:17-120:11). He received two charges for failure to appear in February 1999, but he indicated he could not recall the circumstances of those offenses. (Id. at 121:10-18). Records also indicate he was confined to jail on February 11, 1999, but he did not recall going to jail. (Id.). In 1999, Plaintiff Lewton was charged with theft by unlawful taking, as a result of shoplifting. (Id. at 120:20-121:9). Later in 1999, Plaintiff Lewton was charged with fraud, but he testified that he also could not recall the circumstances of that offense. (Id. at 121:25-122:8). Plaintiffs did not dispute these facts, which were set forth in paragraph 5 of Defendants' initial statement of facts.

e.  In his early twenties, Plaintiff Lewton used cocaine.  (Id. at 33:25-34:2). Additionally, Plaintiff Lewton began using marijuana in his early teens and in October 1998, Plaintiff Lewton was charged with possessing less than an ounce of marijuana. (Id. at 31:11-17, 120:12-15).  Although Plaintiff Lewton testified that he does not currently smoke marijuana, he admitted having done so as recently as about a year before his deposition was taken for this case in 2010.  (Id. at 31:18-22).  Plaintiff Lewton has occasionally used alcohol and marijuana at the same time.  (Id. at 140:10-17). Plaintiffs did not dispute these facts, which were set forth in paragraph 6 of Defendants' initial statement of facts.

f.  In 2003 or 2004, Plaintiff Lewton failed a random drug test at his workplace, after testing positive for marijuana.  (Id. at 133:19-135:7).  Plaintiff Lewton again tested positive for marijuana in 2006.  (Id. at 151:11-152:15).  Plaintiffs did not dispute these facts, which were set forth in paragraph 7 of Defendants' initial statement of facts.

g.  In light of this history, Dianna testified that she purchased the recording device and placed it inside her child's toy because she "was scared for the health and welfare of [her] daughter to be left alone with [Plaintiff Lewton]."  (See Exhibit 203, Dianna Depo. 108:10-25).  Plaintiffs did not dispute this testimony, which was set forth in paragraph 18 of Defendants' initial statement of facts.

4.  Defendants admit that Bianco delivered copies of the recordings to (1) C.G. Jolly; (2) the Honorable David K. Arterburn, the judge presiding over the modification proceeding; (3) Karen Nelson, E.L.'s guardian ad litem in that proceeding; and (4) Drs. Cottam and Wicks, court-appointed therapists.  (Exhibit 201, Bianco Depo.,

64:21-65:4; 67:13-68:3, 70:11-20; Exhibit 202, Bianco Aff., ¶10).  Defendants deny that Bianco "disclosed" the recordings to any of those parties, as suggested by Plaintiffs. (Plaintiffs' Brief, p. 2, ¶4).  Judge Arterburn stated on the record that he had not reviewed the recordings or transcripts and that he would not do so.  (Exhibit 205, 6/3/08 Transcript, 6:10-7:3; 16:1-11).  Additionally, as explained in paragraph 4.c below, there is undisputed evidence that neither Dr. Cottam nor Dr. Wicks listened to the recordings. (See Exhibit 202, Bianco Aff. ¶12; Defendants' Exhibit 223 in Support of Defendants' Motion for Summary Judgment, Supplemental Affidavit of William Bianco ("Supp. Bianco Aff."), ¶¶7, 9; Exhibit 216, Supplemental Affidavit of Karen Nelson, BPS 03364-65, ¶ 1, 5).).  In further response to Plaintiffs' paragraph 4, Defendants state as follows:

a.  Jolly served numerous interrogatories and requests for production on Bianco in the state court action and requested, among other things, videotapes or other recordings of Plaintiff Lewton.   (Exhibit 210, Defendant's Notice of Serving Supplemental Discovery, BPSBN 02992-93; Exhibit 211, Defendant's Supplemental Interrogatories to Plaintiff, BPS 02996; Exhibit 212, Defendant's Supplemental Requests for Production, BPS 02998-299).  Plaintiffs did not dispute these facts, which were set forth in paragraphs 15 and 16 of Defendants' initial statement of facts.

b.  After learning the recordings and transcripts existed, Bianco told Jolly about them because he believed they were relevant to the discovery requests previously served by Jolly.  (Exhibit 201, Bianco Depo. 52:4-25, 53:14-54:13).  In doing so, Bianco was attempting to comply with the rules of civil procedure and with his own ethical obligations.  (Id. at 54:9-13).  Bianco and Jolly discussed the possibility of filing a joint motion to allow the recordings to be used in the modification case, and Jolly asked

Bianco to send him the tapes and indicated he would listen to the tapes and decide. (See Exhibit 201, Bianco Depo, 56:1-22; See also Exhibit 213, June 3, 2008 Emails, BPS 02738-40).  Bianco provided Jolly with the recordings and the transcripts as soon as he received them.  (See Exhibit 201, Bianco Depo., 64:21-65:4).  Plaintiffs did not respond to or dispute these facts, which were set forth in paragraphs 21 and 22 of Defendants' initial statement of facts.

 c.  Bianco also distributed the recordings to the guardian ad litem and the two court-appointed therapists because he believed those individuals were supposed to be kept informed about everything that occurred in the case.  (See Exhibit 201, Bianco Depo., 70:11-72:4; Exhibit 202, Bianco Aff., ¶10).  Plaintiffs did not respond to or dispute these facts, which were set forth in paragraph 29 of Defendants' initial statement of facts.  Additionally, the guardian ad litem's attorney, Karen Davis, had previously instructed Bianco to give all documents relating to the case directly to the guardian ad litem.  (Exhibit 202, Bianco Aff. ¶10).

 d.  When Jolly later filed a motion in limine to exclude the recordings, Bianco provided the judge with a copy of the recordings and transcripts before the hearing, so the judge could rule on Jolly's motion.  (Exhibit 202, Bianco Aff., ¶10).

 e.  After the judge ultimately determined the recordings were inadmissible and declined to review or receive the recordings at the hearing, Bianco immediately retrieved the recordings that had been delivered to Dr. Wicks.  (See Exhibit 202, Bianco Aff. ¶12).  The recordings had been delivered to Wicks' office in a sealed envelope prior to the hearing.  (Exhibit 223, Supp. Bianco Aff., ¶¶7, 9). When Bianco arrived to retrieve the recordings, he found the still-sealed envelope containing the recordings sitting on

the receptionist's desk in Dr. Wicks' office, and he retrieved that still-sealed envelope. (Id. at ¶ 9).   He also attempted to retrieve the recordings from Dr. Cottam but was unable to do so.   (Id.).   However, Bianco did inform Dr. Cottam that the recordings were illegal and that she should not listen to them.   (Id.).   As of June 4, 2008, Dr. Cottam had not listened to the recordings.   (See Exhibit 216, Supplemental Affidavit of Karen Nelson, BPS 03364-65, ¶ 1, 5).   On that same day, Karen Nelson advised Dr. Cottam that it might be illegal to even listen to the recordings.   (Id.).   Plaintiffs did not respond to or dispute these facts, most of which were set forth in paragraph 34 of Defendants' initial statement of facts.

5.   Defendants admit that Bianco had a single brief conversation with Perrone before the hearing, about the general subject of a client recording communications involving her child and other parties.   Defendants deny that Perrone "advised Bianco to let Judge Arterburn determine if the recordings were legal or illegal."  (Plaintiffs' Brief, p. 2, ¶5).   To the contrary, Perrone merely told Bianco, in a general response to Bianco's statement that he did not know what to do about his client's situation, to "let the judge decide."  (See Plaintiffs' Exhibit 8 in Support of Plaintiffs' Motion for Partial Summary Judgment, Deposition of Christopher Perrone ("Plaintiffs' Exhibit 8, Perrone Depo."), 44:5-10).   Defendants admit no conversation took place between Bianco and Perrone concerning the "admissibility" of the recordings and their sole, very general conversation on that topic focused on whether the recordings were legal or illegal.   With regard to Plaintiffs' statement that Bianco believed his conversation with Perrone was 'helpful' in his decision-making" prior to the hearing on Jolly's motion in limine, Defendants admit only that Bianco stated in his deposition that he told Jolly "I was not relying upon

[Perrone], but having a former Sarpy County attorney in my office for situations like this was helpful to me." (Bianco Depo. 86:2-15). Defendants admit that after discussing the issue with Perrone, Bianco believed the recordings were legal. In further response to Plaintiffs' paragraph 5, Defendants state as follows:

a. In May 2008, Bianco told Perrone he had a client who had put a recording device into a teddy bear or a child's toy and he wanted to know from a criminal standpoint whether that action was legal or illegal and whether the client could get into trouble. (See Exhibit 206, Perrone Depo., 23:5-24:5; Exhibit 201, Bianco Depo., 51:11-24). Bianco did not disclose that the recordings were from the Divingnzzo family. (See Exhibit 206, Perrone Depo. 31:2-7). Plaintiffs did not respond to or dispute these facts, which were set forth in paragraph 26 in Defendants' initial statement of facts.

b. This was the sole conversation between Bianco and Perrone about the recordings before the hearing and Perrone did not discuss this conversation or the recordings with anyone else at the time. (Exhibit 206, Perrone Depo. 17:8-18:1, 27:3-13, 29:14-18; Exhibit 201, Bianco Depo., 50:4-51:4). Bianco never indicated to Perrone that he wanted to produce the recordings and use them as evidence. (Exhibit 206, Perrone Depo. 31:13-20). In fact, Bianco never discussed the admissibility of the recordings with Perrone at all, and to Perrone's recollection, Bianco also never discussed the outcome of the court proceeding regarding the recordings. (Exhibit 201, Bianco Depo. 102:18-103:1; Exhibit 206, Perrone Depo. 27:15-28:20). Additionally, Perrone never had possession of the recordings or any transcripts of the recordings. (Exhibit 206, Perrone Depo. 29:19-25; see also Exhibit 221, Perrone's Answers to

Plaintiffs' Interrogatories, No. 3).  Plaintiffs did not respond to or dispute these facts, which were set forth in paragraph 28 in Defendants' initial statement of facts.

c.  Perrone did understand from their single, brief conversation that Bianco was asking him about an active pending case.  (Plaintiffs' Exhibit 8, Perrone Depo. 43:16-20).  Thus, when Bianco ultimately indicated to Perrone that he "didn't know exactly what to do at that point," Perrone told Bianco "you're going to have to let the judge decide."  (Id. at 44:5-10).

6.  Defendants admit that Bianco did not state, **during** the June 2008 hearing on Jolly's motion in limine, that he was supplying the court with the recordings in response to the motion in limine, at Jolly's request, or in response to discovery requests. In further response to Plaintiffs' paragraph 6, Defendants state as follows:

a.  Bianco testified that the attorneys had a conference with Judge Arterburn **prior to the hearing** and, **at that point, Bianco provided the judge with the CD's and "said to the Judge, these are them . . . [t]his is the subject of the motion in limine is [sic] right here."**  (Bianco Depo. 69:13-70:10) (emphasis added).

b.  Moreover, as set forth in paragraph 4.b above and in paragraphs 21 and 22 of Defendants' original statement of facts, Bianco testified that he originally told Jolly about the recordings because he believed they were relevant to the discovery requests previously served by Jolly.  (Exhibit 201, Bianco Depo. 52:4-25, 53:14-54:13).  In doing so, Bianco was attempting to comply with the rules of civil procedure and with his own ethical obligations.  (Id. at 54:9-13).  Bianco further testified that he and Jolly discussed the possibility of filing a joint motion to allow the recordings to be used in Plaintiff Lewton's modification case.  (See Exhibit 201, Bianco Depo., 56:1-22; See also Exhibit

213, June 3, 2008 Emails, BPS 02738-40). Jolly asked Bianco to send him the tapes and indicated he would listen to the tapes and then decide. (See Exhibit 201, Bianco Depo., 56:16-22). Because Plaintiffs did not respond to these properly supported statements of fact, which were set forth in paragraphs 21 and 22 of Defendants' initial statement of facts, these facts are deemed admitted under Local Rule 56.1(b)(1).

7.     Defendants admit that Bianco told the court that he and Jolly "have been going back and forth since we learned of these tapes, whether or not they are illegal or not." (Exhibit 205, 6/3/08 Transcript, 10:3-6). Defendants admit that Bianco said the tapes contained both good things and bad things and that the tapes contained a lot of information.

8.     Defendants admit that Bianco asked the court to receive the recordings "to see where [E.L.] should be placed." Defendants admit that no specific reference to any incident occurring or recorded on the tapes was ever made before the state court. Defendants deny that no evidence of abuse of E.L. appearing on the tapes or transcripts has been indentified. To the contrary, Dianna testified that the recordings consisted of both complete recordings of E.L.'s entire visit with her father, and "audio cuts of the most severe and damaging verbal and physical abuse of E.L." (Plaintiffs' Exhibit 5 in Opposition to Defendants' Motion for Summary Judgment, Deposition of Dianna Divingnzzo, 87:20-88:17). Dianna further testified that she could hear references to physical abuse of E.L. on the recordings. (Id.). Moreover, it is irrelevant whether any abuse was ever actually recorded. The only relevant issue is whether there whether Diana had a basis to suspect abuse, thus justifying the recordings.

9.     Defendants admit that Bianco described the tapes to the court as a "diagnostic tool" that could be used by the professionals in the case.  Defendants deny that Bianco "stated that the counselors needed the 'full picture' of what was provided in the recordings."  (Plaintiffs' Brief, p. 3).   To the contrary, Bianco stated that "these parties are both seeing counselors, and I think counselors need a full picture of what's going on with this child."  (Exhibit 205, 6/3/08 Transcript 11:3-8).  Accordingly, Bianco told the court that the "tape recording . . . provides a window that professionals and this Court can use to see where this child should be placed" and to "cut through some of the representations and see . . . what is in the best interests of this young lady."  (Id. at 11:9-18).   As to the remaining facts in Plaintiffs' paragraph 9, Defendants state as follows:

a.     With regard to Plaintiffs' statement that Bianco said he "made the disclosure of the recordings to the therapists because of the 'trial court's order,'" Defendants admit Bianco indicated that he produced the recordings to the court-ordered therapists because he "believed they are supposed to have all information regarding this case," in light of "Judge Arterburn's orders."  (Bianco Depo. 71:8-72:4).

b.     With regard to Plaintiffs' statement that "no such order appears in this record," Defendants state that Plaintiffs have pointed the Court to no evidence contradicting Bianco's testimony that Judge Arterburn ordered that those parties receive all information relating to the case.  Accordingly, the cited testimony by Bianco is the only evidence before this Court on that issue.

10.     Defendants admit the trial court eventually entered an order finding that the parties had reached an agreement and that both parties were fit and proper

individuals to be awarded joint custody, and that the court expanded Plaintiff Lewton's parenting time and gave him decision-making authority on medical issues.

### III.   ARGUMENT

#### A.   Bianco's Actions Fall Within the Scope of the Attorney Immunity Doctrine, a Recognized Exception to Liability for the Use and/or Disclosure of Illegally Intercepted Communications.

Relying on a Sixth Circuit case, Plaintiffs first contend Bianco is not entitled to attorney immunity for his actions because the Wiretap Act and the Nebraska intercepted communications statutes "provide no exception" to liability for use or disclosure of intercepted communications, including attorney immunity.  (Plaintiffs' Brief, p. 3-4 (citing Fultz v. Gilliam, 942 F.2d 396, 401 (6th Cir. 1991)).   As set forth in Defendants' initial brief, however, the Wiretap Act itself contains several exceptions to liability for use or disclosure of such communications.   See 18 U.S.C. §§ 2511(2)(d); 18 U.S.C. § 2520(2)(d).   Additionally, both federal and state courts have recognized certain other exceptions to liability for wire-tapping violations, including attorney immunity.

For example, in a case decided after Fultz, the Sixth Circuit adopted the vicarious consent doctrine, and many other courts have done so as well.  See Pollock v. Pollock, 154 F.3d 601, 608, 610 (6th Cir. 1998); see also, e.g., Thompson v. Dulaney, 838 F. Supp. 1535 (D. Utah 1993).  In another post-Fultz case, the Sixth Circuit limited Fultz by holding that certain defendants could not be liable for Wiretap Act violations based on their intentional disclosure of intercepted recordings during discovery in a state court action.  Lanier v. Bryant, 332 F.3d 999 (6th Cir. 2003).  The plaintiff in Lanier brought an action under the federal wiretap statute against an attorney and others who prosecuted him in a criminal matter.  Among other claims, the plaintiff alleged that the defendants

disclosed illegal recordings involving him during discovery in the criminal case.    The

Sixth Circuit affirmed summary judgment for the defendants, stating:

> Lanier has presented no authority, and the Court is aware of none, to support the contention that a required disclosure under Federal Rule of Criminal Procedure 16 could constitute an illegal disclosure under the Federal Wiretap Act.  A close examination of Rule 16 and Fultz [v. Gilliam, 942 F.2d 396 (6th Cir. 1991)] leads us to believe that Lanier's contention is untenable.  Under Fultz, "a new and discrete cause of action accrues[s] under section 2511(1)(c) each time a recording of an unlawfully intercepted communication is played to a third party who has not yet heard it."  Id. at 402.  Rule 16, however, requires the government, upon request by the defendant, to disclose certain items for inspection *by the defendant.* See Fed. R. Crim. P 16 (emphasis added).  Since the recordings were of Lanier, and Lanier presumably requested their disclosure during discovery in his criminal prosecution, Lanier and his attorney cannot be considered third parties.  Accordingly, any disclosure made pursuant to Rule 16 could not constitute an illegal disclosure.

Id. at 1005.

Additionally, in both the Eighth Circuit and elsewhere, illegally intercepted

communications may be used for impeachment purposes.  See United States v. Baftiri,

263 F.3d 856 (8th Cir. 2001); Culbertson v. Culbertson, 143 F.3d 825, 828 (4th Cir. 1998)

(citing cases from the Fifth and Ninth Circuits that reached similar conclusions).  In light

of this case law, and the other case law detailed in Section C.2 of Defendants' initial

brief, there is no support for Plaintiffs' contention that "18 U.S.C.A. § 2511(1)(c) and (d)

clearly forbid all intentional disclosures or uses of illegally intercepted communications."

(Plaintiffs' Brief, p. 4).  To the contrary, there are several well-recognized circumstances

under which the use or disclosure of such recordings will not subject a person to liability.

Moreover, at least one federal circuit court has specifically applied the doctrine of

attorney immunity to hold that an attorney was not liable under state wire-tapping laws

for disclosing intercepted communications in the course of a state court proceeding.

Scheib v. Grant, 22 F.3d 149, 156 (7th Cir. 1994).  The Nebraska Supreme Court has also adopted the doctrine of attorney immunity.  Cummings v. Kirby, 343 N.W.2d 747, 748-49 (Neb. 1984).  In this case, the evidence submitted in support of Defendants' Motion for Summary Judgment establishes that Bianco's production of the recordings occurred in the context of the underlying state court domestic relations action.  Bianco did not produce the recordings to any individuals who were not involved in that action.  The purposes behind the attorney immunity doctrine, which seeks to facilitate truth-seeking in the judicial process and zealous advocacy, would be furthered by applying the doctrine under these circumstances and Bianco should be entitled to attorney immunity for his actions.  Further, although Plaintiffs contend that Bianco "could have obtained a protective order prior to disclosing the recordings in the district court case," Bianco had every reason to believe, in light of the federal circuit court case law and Nebraska case law cited above, that a protective order was unnecessary because he was entitled to absolute immunity for his conduct in producing those recordings to the other parties involved in the litigation.  Additionally, a protective order would only have limited the disclosure to persons not involved in the litigation and there is no evidence that any disclosure beyond those individuals occurred.

Plaintiffs also contend attorney immunity is inapplicable because "Bianco disclosed the recordings to parties outside the district court proceedings," namely Jolly, Karen Nelson, Dr. Glenda Cottam and Dr. Patricia Wicks.  (Plaintiffs' Brief, p. 5).  In Scheib, however, the attorneys disclosed the contents of the recorded conversations at issue to the guardian ad litem and the judge in the state court proceeding.  22 F.3d at 151, 157 n.7.  Nonetheless, the Seventh Circuit concluded attorney immunity protected

the attorneys, because they only disclosed the recordings "to persons intimately involved in the ongoing state court litigation."  22 F.3d at 156-57.

Similarly, in this case, all of the individuals cited by Plaintiffs are parties, their legal representatives, or persons otherwise "intimately involved" in the state court proceedings.   For example, Jolly was Plaintiff Lewton's attorney and Bianco was required by Nebraska rules to serve him with the recordings directly.  See Neb. Ct. R. Pldg. § 6-1105(b)(1) (stating that whenever an order, motion, notice or other document is required to be served on a party represented by an attorney, it shall be served upon that party's attorney unless the court orders otherwise).  Similarly, Karen Nelson was E.L.'s guardian ad litem, a person appointed by the court "to investigate the facts and learn where the welfare of his or her ward lies and to report these facts to the appointing court."  Betz v. Betz, 575 N.W.2d 406, 409 (Neb. 1998).  Although Nelson was represented by an attorney, Ann Davis, Davis had previously instructed Bianco to give all documents relating to the case directly to Nelson, to avoid excess cost to the parties. (Exhibit 202, Bianco Aff., ¶10).  Finally, Drs. Cottam and Wicks were court-appointed therapists whom the court had previously indicated were to receive all information relating to the case.  (See Exhibit 201, Bianco Depo., 70:11-72:4; Exhibit 202, Bianco Aff., ¶10).

Even assuming Drs. Cottam and Wicks are considered non-parties, Bianco could not be liable to Plaintiffs for producing the recordings to those individuals in any event. Neither Title III nor Nebraska's intercepted communications statutes impose civil liability for a mere endeavor to disclose or intentionally use illegally intercepted communications.  See 18 U.S.C. § 2520(a); Neb. Rev. Stat. § 86-297(1).  Instead, the

civil remedy provisions of both Acts require actual interception, disclosure or intentional use before a defendant can be subject to civil liability. See DIRECTV, Inc. v. Hoverson, 319 F.Supp.2d 735, 737 (N.D.Tex. 2004). See also Peavy v. WFFA-TV, Inc., 221 F.3d 158, 168-69 (5th Cir. 2000) (§ 2520(a)'s plain and unambiguous language only provides for a civil action against the person or entity which engaged in the actual interception, disclosure or intentional use, and not against an individual who procured interception by another); DIRECTV, Inc. v. Hosey, 289 F.Supp.2d 1259, 1262-64, (D. Kan. 2003) (plain language of § 2520(a) creates a private right of action only against those who actually intercept, disclose or intentionally use oral communications); DIRECTV v. Cardona, 275 F.Supp.2d 1357, 1367 (M.D.Fla. 2003) (unambiguous wording of § 2520(a) limits those against whom a civil action lies to persons who intercept, disclose, or use communications).

In this case, the evidence submitted in support of Defendants' motion establishes that immediately after the hearing on Jolly's motion in limine, Bianco retrieved the recordings given to Dr. Wicks. (Exhibit 202, Bianco Aff., at ¶12). The recordings were originally delivered to Dr. Wicks' office in a sealed envelope and Bianco retrieved the still-sealed envelope containing the recordings from Dr. Wicks' office. (Exhibit 223, Supplemental Affidavit of William Bianco ("Supp. Bianco Aff."), ¶7, 9). He also attempted to retrieve the recordings from Dr. Cottam but was unable to do so. (Exhibit 202, Bianco Aff. ¶ 12). However, Bianco did tell Dr. Cottam that the recordings were inadmissible and she should not listen to them. (Id.). As of June 4, 2008, Dr. Cottam had not listened to the recordings and on that same day, Karen Nelson advised Dr. Cottam that it might be illegal to do so. (See Exhibit 216, Supplemental Affidavit of

Karen Nelson, 03364-365, ¶ 1, 5).  Plaintiffs did not respond to or dispute these facts, most of which were set forth in paragraph 34 in Defendants' initial statement of facts. As such, all such facts should be deemed admitted under Local Rule 56.1(b)(1).  There is no evidence that either Wicks or Cottam actually listened to the recordings.  On this record, the only conceivable argument that Plaintiffs have against Bianco, with respect to Drs. Cottam and Wicks, is that there was an unsuccessful, and non-actionable, attempt to disclose the recordings to those individuals.

In sum, Bianco is entitled to attorney immunity for his actions because he produced the recordings and transcripts at issue only to those individuals who were parties to, or intimately involved in, the state court proceeding.  Further, even assuming Drs. Cottam and Wicks are non-parties, Plaintiffs cannot prove there was an actual disclosure of the recordings to those individuals.  For these reasons and those set forth in section C.1 of Defendants' initial brief, Defendants are entitled to summary judgment on all claims against Bianco.

### B.   Bianco Had a Privilege to Disclose the Recordings for the Purpose of Determining Admissibility.

Plaintiffs also contend Bianco did not have a privilege to disclose the recordings, because the facts do not establish vicarious consent and Bianco did not identify impeachment at the hearing as a basis for admitting the recordings and transcripts into evidence.  (Plaintiffs' Brief, p. 5-6).

Plaintiffs' first argument is flawed because Plaintiffs begin from the premise that the recordings and transcripts were inadmissible.  The purpose of producing the recordings and transcripts to the state court, however, was to obtain a ruling on that very issue.  The fact that the judge ultimately deemed those materials inadmissible does

not make Bianco's conduct in producing those materials to the court improper.  To the contrary, the judge's determination in that regard is the last step in the judicial process that a court must conduct in order to make those determinations and that process cannot be conducted unless the court has access to the evidence at issue.

Additionally, in arguing that case law supporting the disclosure of the recordings is distinguishable, Plaintiffs ignore Bianco's role as an attorney and obligation to zealously defend and promote the interests of his client.  The Nebraska Rules of Professional Conduct provide that a lawyer has the responsibility to "zealously asser[t] the client's position under the rules of the adversary system."  Neb. Rules of Prof'l Cond., Preamble, A Lawyer's Responsibilities, ¶2.  Courts have recognized that intercepted communications may be admissible under the doctrine of vicarious consent or for impeachment purposes, among other circumstances.  Certain facts known to Bianco and outlined in Sections C.2.a & C.2.b of Defendants' initial brief suggested the recordings could be admissible under those exceptions.  Thus, even if there is case law which suggests that some or all of the recordings might ultimately be determined to be inadmissible under those exceptions and even if the state court ultimately declined to receive or review the recordings, the state court had to have the recordings in order to make that determination.  Accordingly, Bianco had a privilege, and a responsibility as a zealous advocate for his client, to produce the recordings and transcripts to the state court and make a good faith argument for a reversal, extension or modification of that existing law.

Additionally, Plaintiffs are incorrect in stating "[t]here is no reference to impeachment or any other evidentiary issue by Bianco in the trial court record."

(Plaintiffs' Brief, p. 6).  To the contrary, Bianco specifically argued that the tapes would allow the court and the professionals involved in the case to "cut through some of the representations and see . . . what is in the best interests of [E.L.]."  (Exhibit 205, 6/3/08 Transcript, 11:11-18).  As noted above, Dianna had "represented" to the state court that Plaintiff Lewton had past problems with drugs and alcohol and that he was abusing E.L. (Exhibit 202, Bianco Aff. ¶5).  Plaintiff Lewton, by contrast, "represented" that Dianna's allegations were false and that he was an appropriate parent for E.L.  (Id.; see also Exhibit 208, Lewton Aff. ¶ 19).  For the foregoing reasons and those set forth in section C.2 of Defendants' initial brief, Defendants are entitled to summary judgment on all claims against Bianco because Bianco had a privilege to disclose the recordings to obtain a ruling on admissibility.

**C.    Bianco was Obligated by Nebraska Discovery Rules and Nebraska Rules of Professional Conduct to Produce the Recordings to the Court and Other Parties.**

In addition to failing to rebut Defendants' arguments regarding attorney immunity and a privilege to disclose, Plaintiffs also failed to respond to Defendants' argument that Bianco was obligated by Nebraska Discovery Rules and Nebraska Rules of Professional Conduct to produce the recordings at issue to the Court and the various other individuals involved in the litigation.  Accordingly, Plaintiffs should be deemed to have conceded this argument and Defendants are entitled to summary judgment on all claims against Bianco for the reasons set forth in section C.3 of Defendants' initial brief.

**D.    Perrone Did Not Act Jointly with and/or Conspire with Bianco to Disclose the Recordings at Issue.**

In Defendants' initial brief, Defendants argued that Perrone cannot be liable on Plaintiffs' various claims because his only involvement in this case arose as a result of

his single, very brief and general conversation with Bianco about the legality of secretly intercepted conversations.    Because there is no evidence that Perrone actually intercepted Plaintiffs' communications or used or disclosed Plaintiffs' communications, the only conceivable claim Plaintiffs have against Perrone is for a non-actionable endeavor to use or disclose the recordings.   In response, Plaintiffs contend that Perrone's actions amount to a civil conspiracy to use or disclose the recordings. (Plaintiffs' Brief, p. 7).   This argument is meritless, and is nothing more than an attempt to avoid the statutorily-imposed limitations on the kinds of conduct that merit civil remedies under state and federal wire-tapping laws.

As Plaintiffs concede, the elements of civil conspiracy include, among other things, "an object to be accomplished," and "a meeting of the minds."  (Plaintiffs' Brief, citing Peavy v. WFAA-TV, Inc., 221 F.3d 158 (5th Cir. 2000)).   In this case, there is no evidence of either.   Bianco and Perrone had a single, general conversation about intercepted communications prior to the hearing, during which Bianco told Perrone only that he had a client who had put a recording device into a teddy bear or a child's toy and he wanted to know, from a criminal standpoint, whether that action was legal or illegal and whether the client could get into trouble.   (See Exhibit 206, Perrone Depo. 17:8-18:1, 23:5-24:5, 27:3-13; 29:14-18; See Exhibit 201, Bianco Depo. 50:4-51:24).   During that conversation, Bianco did not disclose that the recordings were from the Divingnzzo family.   (See Exhibit 206, Perrone Depo. 31:2-7).   Bianco did not indicate that he wanted to produce the recordings and use them as evidence.   (See Exhibit 206, Perrone Depo. 31:13-20).   In fact, Bianco never discussed the admissibility of the recordings with Perrone at all, and to Perrone's recollection, Bianco also never

discussed the outcome of the court proceeding regarding the recordings.  (See Exhibit 201, Bianco Depo. 102:18-103:1; See Exhibit 206, Perrone Depo. 27:15-28:20).  Perrone also never had possession of the recordings or any transcripts of the recordings.  (See Exhibit 206, Perrone Depo. 29:19-25, see also Exhibit 221, Perrone's Answers to Plaintiff's Interrogatories, No. 3).  Plaintiffs did not submit a response to these facts, which were set forth in paragraphs 26 and 28 of Defendants' initial statement of facts.  Accordingly, these facts should be deemed admitted pursuant to Local Rule 56.1(b)(1).

On this record, Plaintiffs can prove neither "an object to be accomplished" nor "a meeting of the minds" between Perrone and Bianco as to the use and/or disclosure of the recordings.  To the contrary, Defendants' evidence in support of summary judgment established that Perrone (1) did not know any specifics about the recordings; (2) did not know that Bianco intended to use or disclose the recordings; and (3) neither gave Bianco any advice regarding the admissibility of the recordings nor discussed with him any possible disclosure or use of those recordings.

For the foregoing reasons and the reasons set forth in section D of Defendants' initial brief, Defendants are entitled to summary judgment on all claims against Perrone.

**E.**  **Defendants are Entitled to Summary Judgment on All Claims by Plaintiffs Adrian Stang, Rita Watson and Tammy Jones Because Those Plaintiffs Had No Reasonable Expectation of Privacy in the Contents of Any Recorded Communications.**

In addition to failing to respond to and/or rebut the various arguments already discussed, Plaintiffs failed to respond to Defendants' argument regarding the claims raised by Plaintiffs Stang, Jones and Watson.  In section E of Defendants' initial brief,

Defendants argued that all claims by those Plaintiffs failed because, as a matter of law, those Plaintiffs did not have a reasonable expectation of privacy in any recorded communications.  Defendants also cited numerous facts in support of this argument, originally set forth in paragraphs 38-46 of Defendants' initial fact statement.  Plaintiffs neither disputed the facts set forth in those numbered paragraphs nor made any other effort to address the arguments set forth in section E of Defendants' initial brief. Accordingly, for the reasons set forth in section E of Defendants' initial brief, Defendants are entitled to summary judgment on all claims by Plaintiffs Stang, Jones and Watson.

## IV.   CONCLUSION

In their response to Defendants' summary judgment motion, Plaintiffs failed to respond to Defendants' statement of facts and either failed to rebut, or failed to even address, numerous arguments raised in Defendants' initial summary judgment brief. Accordingly, all facts set forth in Defendants' initial statement of facts should be deemed admitted, pursuant to Local Rule 56.1(b)(1).  Moreover, for the reasons set forth herein and the additional reasons set forth in Defendants' initial brief, Defendants Bianco, Perrone and Law Firm are entitled to summary judgment on all claims asserted by all Plaintiffs.  Alternatively, Defendants Bianco and Perrone are entitled to partial summary judgment on all claims by Plaintiffs Stang, Watson and Jones.  Because the Law Firm's liability is purely vicarious, the Law Firm is also entitled to summary judgment on all claims dismissed as against those Defendants.

DATED this 20th day of January, 2011.

WILLIAM BIANCO, CHRISTOPHER
PERRONE And BIANCO, PERRONE &
STROH, LLC, Defendants,


By:     /s/ Rex A. Rezac_____
Rex A. Rezac, #17787
Elizabeth A. Culhane, #23632
FRASER STRYKER PC LLO
500 Energy Plaza
409 South 17th Street
Omaha, NE 68102-2663
Telephone: (402) 341-6000
rrezac@fraserstryker.com
eculhane@fraserstryker.com
ATTORNEYS FOR DEFENDANTS
WILLIAM BIANCO, CHRISTOPHER
PERRONE and BIANCO, PERRONE
& STROH LLC

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on January 20, 2010, a true and correct copy of the foregoing was electronically filed on the Court's CM/ECF system, which sent notification of that filing to the following:

John A. Kinney                    Steve Lefler
Kinney Law, P.C., L.L.O.          209 South 19th Street, Suite 440
10812 Elm Street                  Omaha, NE  68102
Omaha, NE  68144


/s/ Rex A. Rezac_____