IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

WILLIAM DUANE LEWTON,
personally, and as father and next friend
of ELLENNA M. LEWTON, a minor
child; ADRIANNE STANG, JENNIFER
HOLTBERG, ROB FORMANEK, RITA
WATSON and TAMMY JONES,

               **Plaintiffs,**

    **v.**

DIANNA DIVINGNZZO, SAM M.
DIVINGNZZO, WILLIAM BIANCO,
CHRISTOPHER PERRONE, and
BIANCO PERRONE & STROH, LLC,

               **Defendants.**

**8:09-cv-00002-FG3**

**MEMORANDUM AND ORDER**

This matter is before the magistrate judge by consent of the parties, *see* 28 U.S.C. § 636(c), on the parties' cross-motions for summary judgment (Docs. 130, 133 and 135), discovery motions (Docs. 112 and 156) and plaintiffs' Motion in Limine (Doc. 115). The court has considered the parties' legal arguments, together with over 6,000 pages of their evidentiary submissions.

For the reasons discussed below, the court finds that defendants Dianna Divingnzzo, Sam M. Divingnzzo and William Bianco violated the provisions of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, as amended by the Electronic Communications Privacy Act of 1986, 18 U.S.C. §§ 2510 et seq. (the "Wiretap Act" or "Title III"). Dianna Divingnzzo and Sam M. Divingnzzo are liable to the plaintiffs for statutory damages on the Wiretap Act

claims.    The court declines to assess damages against William Bianco on the Wiretap Act
claims.

Finally, the court declines to exercise supplemental jurisdiction over the plaintiff's state
law claims.

## I. BACKGROUND

The events giving rise to the plaintiffs' claims arose in conjunction with a dispute between
William Duane ("Duke") Lewton and his ex-wife, Dianna Divingnzzo, over the custody of their
minor child, Ellenna Divingnzzo-Lewton.  Shortly after the state court granted Duke the right
to have unsupervised visits with Ellenna, Dianna inserted a recording device inside Ellenna's
teddy bear and secretly intercepted communications between or among Ellenna and the plaintiffs,
and/or between or among the plaintiffs themselves without Ellenna's participation.   The
recordings were made without the plaintiffs' knowledge or consent and occurred over a period
of several months.

In May 2008, Dianna and her father, Sam Divingnzzo, presented the recordings to
Dianna's attorney in a digital format, using CD-ROM data storage discs, for use as evidence in
the custody dispute.  Dianna's attorney had the recordings copied and transcribed, and supplied
copies of the CDs and transcripts to Lewton's attorney and others involved in the state court case.
The Sarpy County District Court held that the recordings were illegally obtained and were
inadmissible.  This federal lawsuit followed.

In the Amended Complaint, (Doc. 63), plaintiffs assert claims under the Federal Wiretap Act, *see* 18 U.S.C. §§ 2511 and 2520, together with state law claims for invasion of privacy, conspiracy to commit invasion of privacy, and violations of Neb. Rev. Stat. § 86-2,103.

All defendants deny liability. Defendants Bianco, Perrone and Bianco, Perrone & Stroh, LLC affirmatively allege they are immune from liability because they had a privilege to disclose or use the recordings in the context of their legal representation of Dianna Divingnzzo. Dianna Divingnzzo and her father, Sam Divingnzzo, affirmatively allege that they are immune from liability based on Dianna's legal responsibility to protect Ellenna.

## II.  JURISDICTION AND VENUE

Pursuant to 28 U.S.C. § 1331, this court has federal question jurisdiction over plaintiffs' Federal Wiretap Act claims. Venue in this district is proper under 28 U.S.C. § 1391. The court may exercise supplemental jurisdiction over plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

## III.  FINDINGS OF FACT

Plaintiff, William Duane ("Duke") Lewton, and defendant, Dianna Divingnzzo, were married in 2001 and are the parents of Ellenna Divingnzzo-Lewton, born in September 2003. Duke and Dianna separated in December 2003. On May 12, 2004, the Sarpy County District Court entered a decree dissolving the marriage and awarding Dianna Divingnzzo the sole care, custody and control of the infant Ellenna, subject to Duke's rights of reasonable and liberal visitation.

In October 2007, Duke filed a proceeding (the "Custody Case") in the Sarpy County District Court to modify the dissolution decree to award him custody of Ellenna. In response, Dianna alleged that Duke abused drugs and alcohol and was abusive toward Ellenna.

Defendants William Bianco and Christopher Perrone are attorneys and were principals of the defendant law firm, Bianco Perrone & Stroh, LLC. Mr. Bianco was retained in the fall of 2007 to represent Dianna Divingnzzo in the Custody Case. Mr. Perrone had a couple abstract discussions with Mr. Bianco in May 2008 concerning the Divingnzzos' activities, but he did not represent either of the Divingnzzos and did not ever give the Divingnzzos any legal advice about anything.

Defendant, Sam M. Divingnzzo, is the biological father of Dianna Divingnzzo. He paid for Bianco's fees, and was present during several meetings between Dianna and Bianco.

In the Custody Case, the state district court awarded Duke unsupervised parenting time with Ellenna, to commence in January 2008. In late December 2007 or early January 2008, prior to the first unsupervised visit, Dianna inserted a recording device in Ellenna's favorite toy, a teddy bear ("Little Bear"), so that Dianna could record Ellenna's time alone with Duke. She had purchased the device "online" in December 2007 with the intention of placing it in Little Bear. Dianna personally told Duke that Ellenna was insecure without her teddy bear and needed to take Little Bear everywhere she went. Dianna's attorney, Bianco, also informed Duke's attorney, C.G. Jolly, that Ellenna would need to take Little Bear everywhere she went.

-4-

During her deposition, Dianna admitted that she placed the recording device in Little Bear. She maintained that Duke was physically and verbally abusive[1] to Ellenna and stated that Duke only wanted visitation rights to mess up her and Ellenna's lives.  In December 2007, Dianna  unstitched part of the bear, inserted the recording device, and never took it out except for when she washed the toy.  The device was not voice activated, and "recorded from beginning to end." (Depo. of Dianna Divingnzzo, 148:7-17).  Dianna transferred the information from the recording device to her computer by undoing a few stitches and using a USB port.

From January 2008 through May 14, 2008, the eavesdropping device hidden in Little Bear recorded Duke's visits with Ellenna, and any other events that transpired in the toy's presence.  After each visit between Ellenna and Duke, Dianna downloaded the data from the

---

[1]The specific incident of "abuse" emphasized by Dianna involved Duke's attempt in May 2007 to prevent Ellenna from riding a Big Wheel into the street.  Dianna testified that the recordings from Little Bear "would be a catalog of the abuse to prevent [Duke] from having custody or further unsupervised visitation at the time they were disclosed."  (Depo. of Dianna Divingnzzo, 133:14-17).  Dianna took a series of photographs of Ellenna, beginning July 2007, when Ellenna was allowed to be alone with Duke and Rita Watson, to document the child's alleged injuries.  Dr. Charles Sprague, an expert retained by the plaintiffs, examined over 200 of these photographs "that somebody thought was evidence of abuse," and stated, "the fact that this poor girl had to sit through all of these photos I find disturbing."  Doc. 146-6 at p. 6/20, Sprague Depo. at 20:11-19.  Dr. Sprague's first and overwhelming impression was the sheer volume of the photos.  Based on the backgrounds and child's clothing, it appeared that the photos were obtained over a period of time in a home setting by an non-professional person.  Most of the photos depicted common medical conditions or typical childhood bruising.  There were several photographs depicting injuries in unusual locations; however, based on the photographs, Dr. Sprague had very little concern that the child was being physically abused.

At her deposition, Dianna testified that she placed the recording device in Little Bear because:

Ellenna told me she was scared. Ellenna told me she hated him. Ellenna told me she didn't want to go with him. Ellenna did not want to go on the visits and was screaming and crying every time Rita picked her up or every time Rita drove her away from me when she left my side. She told me he was mean to her. She told me Rita was mean to her. She told me that he hurt her. She told me that he wouldn't let her have water. He wouldn't let her have drink. That he threw away her lunch. She told me that she wanted the visits to stop. She told me that she didn't want to spend time with him. She told me that she did not want to get to know him. Continually used the word mean. He hurt me. He argued with me. He calls me a liar. He tells me I'm stupid.

134:6-21.  Ellenna was about 4 years old during this time period.

recording device to her home computer.  In May 2008, in anticipation of a court hearing in the Custody Case, Dianna copied the recordings to compact discs (CDs) and gave the CDs to her father, Sam Divingnzzo, so he could transcribe them.  Sam Divingnzzo listened to the CDs and transcribed the recordings.

Dianna disclosed the recordings to her attorney, William Bianco, in May 2008.  On May 30, 2008, Sam Divingnzzo signed a sworn affidavit for use in the Custody Case stating that he, along with Dianna, had a digital recording device placed in Ellenna's toy without Ellenna's knowledge and without the knowledge and/or consent of Dianna's attorney.  During his deposition taken March 11, 2010, however, Sam Divingnzzo denied knowing of the recording device until Dianna presented him with the CDs and asked him to transcribe the conversations.  Divingnzzo later maintained that he signed the affidavit without reading it.  The individual who notarized the affidavit, however, testified that she gave Sam Divingnzzo the entire document and asked him to read it before he signed it.

Dianna Divingnzzo selected the conversations that were transferred from her computer to CD[2].  Sam Divingnzzo testified at his deposition that he did not know why Dianna planted the eavesdropping device in Little Bear, did not know when it was planted or removed, and that he was not involved in the destruction of the device.  It took almost 3 weeks for Sam to transcribe the recordings.  He recognized some of the voices in the recordings, was able to otherwise identify the people who were recorded, and did not have any fears or concerns about the legality

_____

[2]Dianna admitted during her deposition that there were edited and unedited versions of the recordings she made with the device concealed in Little Bear.  "There was the entirety of the taping for the whole day's event of Ellenna with her dad, and then there were the audio cuts of the most severe and damaging verbal and physical abuse of Ellenna."  Dianna personally selected these audio cuts.

of his actions.  He printed at least two copies of the transcriptions on his home computer and gave them to Mr. Bianco.  Dianna made extra copies of the CDs at the request of Mr. Bianco, and Sam delivered them to Bianco's office.

Duke's attorney, Mr. Jolly, had served discovery requests in the state court Custody Case for the production of videotapes or other recordings of Duke's actions and conduct.  After receiving the "Little Bear" recordings from Dianna Divingnzzo in May 2008, Bianco contacted Jolly by telephone and told him the recordings existed.  At Jolly's request, Bianco had a copy of the recordings and transcripts delivered to Jolly.  Bianco had generally discussed the existence of the recordings with his law partner, Christopher Perrone, who ultimately advised Bianco to let Judge Arterburn determine if the recordings were legal or illegal.  Mr. Perrone never had possession of the recordings or any transcripts of the recordings.

On June 2, 2008, Mr. Jolly filed a motion in limine (Doc. 132 at p. 38/107) to exclude the recordings as illegally intercepted under Neb. Rev. Stat. § 86-290(a) (*see* Doc. 137-16 at p. 14/42; Doc. 132-1 at p. 67/124).  Prior to the hearing on the motion in limine, Mr. Bianco placed copies of the recordings in sealed envelopes and had the sealed envelopes delivered to guardian ad litem Karen Nelson and her attorney, Ann Davis; Dr. Patricia Wicks; and Dr. Glenda Cottam.  Wicks and Cottam were mental health professionals who had been appointed by the court to provide opinions regarding the child and parents for the benefit of the court.  Bianco also delivered copies of the recordings and the transcripts to the court, so the court could rule on the motion in limine.  According to Bianco, the guardian ad litem's attorney, Ann Davis, had previously instructed him to produce all materials that would be of interest to the guardian ad

-7-

litem.  It was Bianco's understanding that Nelson, Wicks and Cottam were supposed to receive copies of any evidence bearing on the child custody issues.

The motion in limine was heard on June 3, 2008.  Mr. Bianco argued that the recordings were admissible and urged the court to listen to the recordings.  Judge Arterburn, however, determined that the recordings were not admissible; there were no applicable exceptions to the Nebraska Telecommunications Consumer Privacy Protection Act, *see* Neb. Rev. Stat. § 86-2,103 *et seq.*; no consent was given; and the recordings were illegally obtained.

Dianna testified that she destroyed the recording device with a sledgehammer in her driveway on the day Judge Arterburn said she could not listen to or have the recordings.  She testified that she deleted the recordings from her home computer within a few days because she was told she was not supposed to have them.  The recording device was destroyed before this lawsuit was filed.  She no longer has the computer she was using to store the recordings; her home computer was "killed" by a power surge, so she replaced it with a new one.  She recycled the old computer at Best Buy.

Sam Divingnzzo testified that he deleted the Word version of the transcript from his home computer after Judge Arterburn determined that the recordings were not admissible.  He stated that he gave this computer to Goodwill, but removed the drives.  He was not present when Dianna destroyed the recording device with a sledgehammer.

Judge Arterburn entered a written order on June 9, 2008 (Doc. 132-1 at p. 75/124) providing that custody of Ellenna would remain with the court, entering a summer parenting

plan, and ordering Duke and Dianna to continue to participate in counseling.  The June 9, 2008

order further provides, at paragraph 4:

> The Court finds that due to their continued interference with the relationship
> between the minor child and the Defendant [Duke], the best interests of the child
> require that the child's grandparents, Marilyn and Sam Divingnzzo exercise only
> supervised and/or therapeutic visitation by either Visinet, Dr. Cottam or another
> approved provider as designated by the guardian ad litem.  Said order is found to
> be necessary based on the best interests of the minor child and the continued
> disregard of the Court's prior orders by the grandparents of the child, Sam and
> Marilyn Divingnzzo.

Sam and Marilyn Divingnzzo were also forbidden to pick up or deliver Ellenna to her daycare

provider.[3]  Judge Arterburn's June 9, 2008 order, at paragraphs 6 and 7, also notes that Dianna's

"continued disregard for the Court's prior orders coupled with the continued issues of parental

alienation" caused Duke to incur a significant level of attorney fees, and that Dianna and her

family "have acted in concert to take actions which have resulted in unjustified costs and fees"

---

[3]The supplemental affidavit signed by the guardian ad litem, Karen Nelson, on June 5, 2008 (Doc. 132-1 at pp. 81-84/124) is instructive.  On the morning of June 4, 2008, Duke contacted Nelson and reported that Ellenna had been expelled from daycare, he was being blamed for her expulsion because he had subpoenaed the daycare records, and he did not know where to pick up Ellenna for his Wednesday night visitation. Nelson contacted Mr. Bianco, who confirmed that Ellenna had been "kicked out" of daycare and was with Sam and Marilyn Divingnzzo.  Nelson contacted the daycare provider, who advised that she and Dianna Divingnzzo reached a "mutual decision" on June 2, 2008 to remove Ellenna from the daycare after the provider became aware that Ellenna's teddy bear had been "bugged" and included the bugging of communications at the daycare.  In any event, Ellenna had not been attending the daycare for the past 2-3 weeks except for immediately prior to and immediately after Duke picking her up and dropping her off. Nelson learned that Dr. Cottam had also discovered that Little Bear was bugged.  Dr. Cottam believed that some of the therapy sessions had been bugged because Sam Divingnzzo had been at the sessions, handing Little Bear to Ellenna and reminding Ellenna to not forget her stuffed animal.

Ms. Nelson expressed great concern that Dianna Divingnzzo had attended the June 3, 2008 court hearing knowing that the court retained custody of Ellenna, she no longer licensed daycare for Ellenna as ordered by the court, and yet said nothing about this development.  Nelson noted that the court was concerned about Ellenna's exposure to Marilyn and Sam Divingnzzo due to their continued sabotaging of the child's relationship with Duke, yet Dianna continued to rely on her parents to provide care for Ellenna, thereby continuing the child's exposure to these individuals.

-9-

incurred by Duke.  Finally, Dianna was forbidden to "engage in any further surveillance activity of [Duke] by way of a private investigator[4], implantation of surveillance devices, or any other surveillance method" without the prior permission of the court.

After the June 3, 2008 hearing, Mr. Bianco immediately retrieved the sealed envelope containing the recordings that had been delivered to Dr. Wicks.  He was unable to retrieve the recordings given to Dr. Cottam, but did advise Dr. Cottam that the court had found the recordings to be inadmissible, and she should not listen to them.

On October 21, 2008, Judge Arterburn entered an Order of Modification (Doc. 124-7) approving a written settlement agreement submitted by Duke and Dianna and finding, *inter alia*, that Duke and Dianna were both fit and proper persons to be awarded the joint legal custody of their minor child.  Dianna was granted primary possession of the child during the school year, subject to Duke's rights to reasonable visitation.

In addition to recording oral communications between Duke and Ellenna, the device implanted in Little Bear intercepted oral communications involving the other plaintiffs in this action.

Plaintiff Adrianne Stang was a neighbor of Duke Lewton and socialized occasionally with Duke and Duke's girlfriend, Jennifer Holtberg.  Duke sometimes brought Ellenna over to play with Stang's 7-year-old daughter.  Stang testified at her deposition that Duke seemed like a good

---

[4]Dianna Divingnzzo hired at least two private investigators to monitor Duke.  She first hired Lee Legenhausen to find out where Duke lived and to prove he was an alcoholic.  She then hired Brett Pippin, who began surveillance on Duke on July 29, 2007.  Dianna consented to Pippin's placing a global positioning device on three vehicles used by Duke.  Dianna received Pippin's first report by e-mail, and edited it for content.

father and seemed very protective of Ellenna.  Stang became aware of the recording device in Little Bear when Duke asked her if she would participate in this lawsuit.  Duke told Stang that she had been recorded on Ellenna's Little Bear one time while Duke was over when the girls were playing.  She did not listen to the recording or review a transcript of the recording.  Stang recalled a conversation that took place when Duke was standing there with Little Bear in his hand while Ellenna was playing with Stang's daughter.  The two adults visited while the girls were playing. Stang could not remember exactly what they had been talking about.  Stang was, however, upset that her private conversation was recorded without her knowledge or permission, and she was concerned that other people had listened to her conversation.

Plaintiff, Jennifer Holtberg, testified that she met Duke Lewton through Holtberg's cousin, Brandon Krivanek.  Holtberg is employed full-time, has been with Duke for approximately 6 years, and lives with Duke Lewton.  She testified at her deposition that she and Duke intended to go through with a religious ceremony, but would never be legally married due to the continuing conduct of Dianna Divingnzzo and the Divingnzzo family.  When they first met, Duke told her that he was married and had a baby, Dianna had asked him to leave, and he left.  Holtberg testified that Dianna and Sam Divingnzzo had attacked her personally by following her, taking pictures of her, recording her, asking a detective to do certain things, and generally invading her privacy.  She first became aware that her conversations were recorded when Duke called her at work one day and told her they had been recorded for months in their own home.  Holtberg started crying; she felt embarrassed, humiliated and violated.  She did not personally listen to all of the recordings or read all the transcripts of the recordings.  Holtberg

noted that Ellenna owned several Little Bears; she and Duke would find more than one in the house at a time, and Ellenna would leave a Little Bear at Duke's house when she left. Holtberg observed that "censored" and "uncensored" versions of the CDs had been distributed to various people. Due to the presence of "Little Bear" in the house when Ellenna was not there, Holtberg suspected that she and Duke were being recorded when Ellenna was not present, and the Divingnzzos had not disclosed all of the recordings that they actually made.

Plaintiff, Rob Formanek, is Duke Lewton's cousin and has known Duke since childhood. Formanek met Dianna Divingnzzo while she was dating Duke. He had met Sam Divingnzzo, possibly at the wedding. Formanek, a divorced father with three children, perceived Duke to be a normal father who kept his patience with his daughter. At some point, Duke informed Formanek that Dianna Divingnzzo had been recording conversations with the device planted in Little Bear. Specifically, Ellenna brought Little Bear to Formanek's house when she and Duke attended a family dinner in April or May 2008. Afterwards, the toy was left in Formanek's van for at least 4-5 days, during which time he had many conversations. Duke then retrieved the Little Bear at Formanek's place of business. Formanek was upset that the recording was allowed to occur; he felt violated. He was going through a divorce at the time and did discuss the matter with Duke, but not in Ellenna's physical presence. Formanek said he felt somewhat vulnerable and absolutely frustrated, knowing that the recordings of his conversations with Duke had been distributed to various participants in the Custody Case.

During the time period in question, plaintiff Rita Watson was employed full time by Visinet, a company in the business of providing people to conduct supervised visits. Watson

holds a bachelor of science degree in family science and began working for Visinet in 2001. The court had ordered supervised visits in this matter. In September 2007, Watson accepted a private case assignment to supervise Duke's visits with Ellenna and report to the guardian ad litem. Watson's role was to maintain safety of the child and to form an opinion on whether Duke was a fit parent. She met with Duke and Ellenna once a week from September 2007 through April 2008 and saw no indication that Duke had ever abused Ellenna in any way. According to Watson, the early visits were very difficult. Ellenna was about 3 or 4 years old, had not seen her father for a while, and had been told that her father was a bad man. Ellenna related that she was told that her father was a stranger, and she was afraid of strangers.[5]  It took about a month and a half to actually help Ellenna feel comfortable with Duke. In May or June 2008, Duke told Watson that a recording device had been put in Little Bear (which was never not around) and it had been submitted to the court. She knew her conversations were recorded during visits because the toy was around all the time. Once the visits started at Duke's house, Watson was responsible for transportation and drove Ellenna from his house to Dianna's house, and those conversations would have been recorded. Watson recalled that Ellenna may have left Little Bear in her car over a weekend, during which time Ellenna was not present. Upon learning of the Divingnzzos' recording her conversations, Watson was mad because the case had affected her both personally and professionally. Watson stated that there were false allegations made that she was having a relationship with Duke, and that she was physically and mentally harmful to Ellenna. Knowing what she did about the case, Watson felt that the Divingnzzos intended to

---

[5]Dianna admitted during her deposition that she told Ellenna that Duke was a stranger. (Depo. of Dianna Divingnzzo, 86:18-20).

misrepresent her statements and malign her professional reputation.  Watson did discuss these problems with the guardian ad litem.  She had intended to drop the case the first time she heard that Dianna Divingnzzo was trying to hire someone to follow her outside of visits, but ultimately decided to remain because of the significant progress they had made with Ellenna and her relationship with Duke.  Rita Watson stopped taking private cases due to the invasions of privacy caused by this incident.

Plaintiff, Tammy Jones, is the office manager of Cottam Psychological Service.  She was in contact with Duke and Ellenna when they came into the office for their appointments with Dr. Cottam.  Dr. Cottam's policy was to talk to the parents, then spend time with the child, and then talk to the parents again.  When the parents were with Dr. Cottam, Jones was with the children making sure that they were taken care of out front or in the play room.  During these times, Jones and Ellenna would talk about school, when she would go to her grandparents, what she had for lunch, and the like.  Ms. Jones observed the interactions between Ellenna and each of her parents and saw nothing of concern.  She testified that Ellenna always had Little Bear with her and took Little Bear into Dr. Cottam's office.  Sam Divingnzzo sometimes brought Ellenna to the sessions and also made a couple of unscheduled appearances to talk to Dr. Cottam without Ellenna.  Ellenna stopped seeing Dr. Cottam "after all of this stuff came out with the tapes."  Jones first learned of the existence of the recordings when Dr. Cottam asked her to listen to the CDs delivered by Mr. Bianco's office.  Karen Nelson called shortly thereafter and told Jones not to listen to the CDs because the recordings were obtained illegally.  Jones testified she did not ever listen to the CDs.  She discovered that some of her own conversations had been recorded when

-14-

Duke came into the office for a session with Ellenna. This revelation was very upsetting because other clients came into the office, she had been talking to other patients, and those conversations were recorded. Jones testified that the incident has adversely affected her ability to openly communicate with clients. Ms. Jones recalled that Mr. Bianco's office had contacted Dr. Cottam asking for the CDs shortly after the June 2008 court hearing. Dr. Cottam kept the recordings. Sam Divingnzzo showed up at Dr. Cottam's office in April 2009 to retrieve the recordings; however, Divingnzzo did not leave the office with the CDs at that time.

## IV.  CONCLUSIONS OF LAW

### A.  Summary Judgment Standard of Review

Summary judgment may be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "'An issue of fact is genuine when "a reasonable jury could return a verdict for the nonmoving party" on the question.'" *United States v. $256,235.97*, 691 F. Supp. 2d 932, 935 (N.D. Iowa 2010) (quoting *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005), and *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is material when it "might affect the outcome of the suit under the governing law." *Id.* at 936 (quoting *Anderson*, 477 U.S. at 248).

### B.  Federal Wiretap Act Claims

#### 1.  Liability

The civil damages provision of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, as amended by the Electronic Communications Privacy Act of 1986, 18 U.S.C. §§

-15-

2510 *et seq.* (the "Wiretap Act" or "Title III") affords a private right of action to "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter[.]"  18 U.S.C. § 2520(a).  The activities constituting violations of the Wiretap Act are described in 18 U.S.C. § 2511.

Subject to certain exceptions not relevant in this case, § 2511(1) imposes liability for any person who–

> (a) intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication;
>
> (b) intentionally uses, endeavors to use, or procures any other person to use or endeavor to use any electronic, mechanical, or other device to intercept any oral communication when–
>
>> (i) such device is affixed to, or otherwise transmits a signal through, a wire, cable, or other like connection used in wire communication; or
>>
>> (ii) such device transmits communications by radio, or interferes with the transmission of such communication; or
>>
>> (iii) such person knows, or has reason to know, that such device or any component thereof has been sent through the mail or transported in interstate or foreign commerce; or
>>
>> (iv) such use or endeavor to use (A) takes place on the premises of any business or other commercial establishment the operations of which affect interstate or foreign commerce; or (B) obtains or is for the purpose of obtaining information relating to the operations of any business or other commercial establishment the operations of which affect interstate or foreign commerce; or
>>
>> (v) such person acts in the District of Columbia, the Commonwealth of Puerto Rico, or any territory or possession of the United States;
>
> (c) intentionally discloses, or endeavors to disclose, to any other person the contents of any wire, oral, or electronic communication, ***knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection***; [or]
>
> (d) intentionally uses, or endeavors to use, the contents of any wire, oral, or electronic communication, ***knowing or having reason to know that the***

> *information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection*[.]

18 U.S.C. § 2511(1)[6] (emphasis added).

In interpreting the federal Wiretap Act, this court is bound by the legal precedent set by the Eighth Circuit Court of Appeals.  More than 20 years ago, the Eighth Circuit adopted the position that the Wiretap Act "'prohibits all wiretapping activities unless specifically excepted'" by the Wiretap Act.  *Kempf v. Kempf*, 868 F.2d 970, 973 (8th Cir. 1989) (quoting *Pritchard v. Pritchard*, 732 F.2d 372, 374 (4th Cir. 1984); *accord Milke v. Milke*, 2004 WL 2801585, Case No. 03-6203 (D. Minn. June 14, 2004).

A respected commentator has observed that "[m]any courts have been reluctant to accept the straightforward prohibition in Title III of all surveillance that the statute does not authorize." 2 Hon. James Carr & Patricia L. Bellia, Law of Electronic Surveillance § 8:29 (Westlaw Feb. 2011).  This court agrees with the authors' assessment that, "[w]hile the notion that a parent or guardian should be able to listen to a child's conversations to protect the child from harm may have merit as a matter of policy, it is for Congress, not the courts, to alter the provisions of the statute." *Id*.  This position is consistent with the Eighth Circuit's binding decision in *Kempf v. Kempf* acknowledging that the Wiretap Act prohibits *all* wiretapping unless specifically excepted.[7]

---

[6]In this case, the plaintiffs' claims are based on the provisions of subsections (a)-(d); therefore, the text of subsection (e) has been omitted as irrelevant to this action.

[7]The limited "good faith reliance" defense articulated in the Wiretap Act does not apply to private actors such as the defendants in this case.  *See* 18 U.S.C. § 2520(d); *Rice v. Rice*, 951 F.2d 942, 945-46 (8th Cir. 1991).

Nor does the "consent exception" included 18 U.S.C. § 2511(2)(d) absolve the defendants of liability under the circumstances presented here.  Section 2511(2)(d) provides:

> It shall not be unlawful under this chapter for a person not acting under color of law to intercept a wire, oral, or electronic communication where such person is a party to the communication or where one of the parties to the communication has given prior consent to such interception unless such communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State.

Even assuming (without deciding) that Dianna Divingnzzo could legally give "vicarious consent"[8] on Ellenna's behalf, the uncontroverted evidence shows that the bugging of Little Bear accomplished much more than simply recording oral communications to which Ellenna was a party.  Rather, the device was intentionally designed to record absolutely everything that transpired in the presence of the toy, at any location where it might be placed by anybody.

The evidence demonstrates conclusively that the device recorded many oral communications made by each of the plaintiffs, to which Ellenna was not a party.

Turning to the attorney defendants' invocation of common-law "immunity" and "litigation privilege" defenses, the court was unable to find any binding authority holding that an attorney who uses a communication intercepted in violation of the federal Wiretap Act is entitled to blanket immunity from Title III liability.[9]  The court did find persuasive authority to the contrary.

---

[8]*See Thompson v. Dulaney,* 838 F. Supp. 1535, 1543 (D. Utah 1993) (addressing the "unique legal question of first impression on the authority of a guardian to vicariously consent to the taping of phone conversations on behalf of minor children who are both incapable of consenting and who cannot consent in fact").  The "vicarious consent" doctrine, however, "should not be interpreted as permitting parents to tape any conversation involving their child simply by invoking the magic words: 'I was doing it in his/her best interest[.]'" *Babb v. Eagleton,* 616 F. Supp. 2d 1195, 1205-06 (N.D. Okla. 2007) (quoting *Pollock v. Pollock,* 154 F.3d 601, 610 (6th Cir.1998)).

[9]It is possible that such a defense is available as to the plaintiffs' state law claims.  *See Scheib v. Grant*, 22 F.3d 149 (7th Cir.), *cert. denied,* 513 U.S. 929 (1994).  In *Scheib v. Grant*, the court determined that there

*See Babb v. Eagleton*, 616 F. Supp. 2d 1195, 1207 (N.D. Okla. 2007); *Nix v. O'Malley*, 160 F.3d 343, 353-54 (6th Cir. 1998) (declining law firm's "invitation to immunize attorneys for certain violations of Title III and Ohio wiretap law" and noting that "this proposed immunity contravenes the plain language of federal and state wiretap statutes"); *United States v. Wuliger*, 981 F.2d 1497, 1505 (6th Cir. 1992) ("There is nothing in the Act which affords attorneys special treatment."); *Kratz v. Kratz*, 477 F. Supp. 463, 475 (E.D. Pa. 1979) (plaintiff's cause of action under 18 U.S.C. § 2520 was provided by federal law and could not subverted by any state law or policy prohibiting one spouse from bringing suit against the other).

Courts have recognized a "defense exception" to Title III's strict prohibition on disclosure, but only when the client discloses the intercepted communications to an attorney for the purpose of investigating or defending a Title III claim. *See Nix v. O'Malley*, 160 F.3d at 351; *Smoot v. United Transp. Union*, 246 F.3d 633, 646 (6th Cir. 2001) (the defense and adjudication exceptions did not apply to client's distribution of a transcript to his lawyer or the attachment of the transcript to a pleading because the client was not then defending against charges brought under the Wiretap Act); *Williams v. Poulos*, 11 F.3d 271, 291 n.44 (1st Cir. 1993), citing *McQuade v. Michael Gassner Mech. & Elec. Contractors, Inc.*, 587 F. Supp. 1183, 1188-89 (D. Conn. 1984) (disclosure of the contents of intercepted recordings to counsel, for the purpose of preparing a defense, is not a crime). *Cf. Peavy v. WFAA-TV, Inc.*, 221 F.3d 158 (5th Cir. 2000) (defendants' disclosure to their attorney was nonprivileged and actionable because the disclosure

---

was no federal Wiretap Act violation because the interception fell within the "extension phone exemption"of 18 U.S.C. § 2510(5)(a)(i). Applying Illinois law, the court held that the attorney defendants and the guardian ad litem enjoyed absolute immunity from liability under the Illinois Eavesdropping Act.

was not made for the purpose of defending against Wiretap Act claims).  In this case, both of the

Divingnzzos and attorney Bianco distributed and used the intercepted communications to bolster

Dianna Divingnzzo's  arguments  in the Custody Case, not to investigate or defend any Title III

claim.

Presenting the intercepted communications to Judge Arterburn for a determination of

admissibility was consistent with the procedure set out in 18 U.S.C. § 2518(10)(a), which

provides:

> Any aggrieved person in any trial, hearing, or proceeding in or before any
> court, department, officer, agency, regulatory body, or other authority of the
> United States, a State, or a political subdivision thereof, may move to suppress the
> contents of any wire or oral communication intercepted pursuant to this chapter,
> or evidence derived therefrom, on the grounds that–
>
> (i) the communication was unlawfully intercepted[.]
>
> * * *
>
> ....  The judge, upon the filing of such motion by the aggrieved person, may in his
> discretion make available to the aggrieved person or his counsel for inspection
> such portions of the intercepted communication or evidence derived therefrom as
> the judge determines to be in the interests of justice.

*See McQuade v. Michael Gassner Mech. & Elec. Contractors, Inc.*, 487 F. Supp. at 1189 n.12.

In this context, the court agrees that Mr. Bianco had a professional obligation to tell Mr.

Jolly of the existence of the "Little Bear" recordings and transcripts, and the circumstances under

which they were obtained, once the Divingnzzos disclosed that information to him.  With that

rudimentary information, Mr. Jolly would have had a basis for filing the appropriate motion in

the Custody Case, challenging the legality of the interception without actually listening to the

recordings or reviewing the transcripts prepared by Sam Divingnzzo.

-20-

The court finds that Mr. Bianco did not act improperly in presenting the materials to Judge Arterburn for a ruling on admissibility.  It does not follow, however, that Mr. Bianco was obligated or entitled to distribute the materials to anyone else.  Considering the basis for Mr. Jolly's motion in limine (that the communications were unlawfully intercepted), together with the provisions of the Wiretap Act and the case law interpreting the Wiretap Act, this court is unable to articulate any justification for Mr. Bianco's distributing copies of the recordings and transcripts to Mr. Jolly, the guardian ad litem, counsel for the guardian ad litem, Dr. Wicks, and Dr. Cottam in advance of Judge Arterburn's ruling, without the express permission of Judge Arterburn.

To recover civil damages under § 2520(a), the plaintiffs must prove by a preponderance of the evidence that (1) their oral communications; (2) were disclosed or intentionally used in violation of 18 U.S.C. § 2511(1); (3) by the defendants they wish to hold accountable for engaging in that violation.  *See, e.g., Zinna v. Cook*, 2010 WL 3604170 at *7 (Report & Recommendation of June 2, 2010), *adopted*, 2010 WL 3604386, Case No. 06-1733 (D. Colo. Sept. 7, 2010).

An "oral communication" is defined in the Wiretap Act as "any oral communication uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation." 18 U.S.C. § 2510(2).  The court finds that all of the plaintiffs exhibited expectations that their oral communications were not subject to interception, and the circumstances of each incident justified the plaintiffs' expectation that their oral communications were not subject to interception.

-21-

To prove an "interception" violation of the Wiretap Act, see 18 U.S.C. §§ 2511(a) & (b), a plaintiff need only show that the defendant intentionally, rather than inadvertently, intercepted the plaintiff's oral communication. *See, e.g., Bess v. Bess*, 929 F.2d 1332, 1334-35 (8th Cir. 1991); *Lombardo v. Lombardo*, 192 F. Supp. 2d 885, 892 (N.D. Ind. 2002); *Thompson v. Dulaney*, 970 F.2d 744,748 (10th Cir. 1992) (noting that there is no liability for inadvertent interceptions, and the proper focus is on the volitional nature of the act of intercepting the communication).

To establish liability for use or disclosure of the communications, *see* 18 U.S.C. §§ 2511(c) & (d), the plaintiffs must show that the defendants were aware of the factual circumstances that would violate the statute. *See Thompson v. Dulaney*, 970 F.2d 744, 749 (10th Cir. 1992).

The record conclusively demonstrates that all of the defendants were fully aware of the facts of their conduct. There is no evidence whatsoever that either of the Divingnzzos sought the advice of counsel[10] as to the legality of their course of action prior to bugging the teddy bear, intercepting the plaintiffs' oral communications, transcribing the plaintiffs' private conversations, and delivering the entire bundle to Mr. Bianco after the fact. Sam Divingnzzo admits that he signed a sworn affidavit stating that he and Dianna had a digital recording device placed in Ellenna's toy. He was given the opportunity to review the affidavit prior to signing it, and then

---

[10]Dianna Divingnzzo testified at her deposition that she did consult a "Douglas County police officer of some sort" to see if they thought the recordings were illegal to make or listen to. She complained that she "was referred and referred and referred to different people who picked up the phone and ended up with some guy who said he was an expert in wire tapping and did it for the Douglas County." (Dianna Divingnzzo Depo., 61:20-62:8). She did not write his name down or anything. *Id.* at 64:24-25.

-22-

signed it.  To the extent the defendants are arguing that they should not be held liable because they believed that intercepting the plaintiffs' oral communications in this manner was lawful, "'innocence cannot be asserted of an action which violates existing law, and ignorance of the law will not excuse.'"  *Milke v. Milke*, 2004 WL 2801585 at *2 (quoting *Shevlin-Carpenter Co. v. Minnesota*, 218 U.S. 57, 68 (1910)).  *See also Fultz v. Gilliam*, 942 F.2d 396, 404(6th Cir. 1991) (defendant's professed ignorance as to the existence of the law prohibiting interspousal wiretapping was no excuse).  The relevant existing law in this jurisdiction is that the Wiretap Act "'prohibits all wiretapping activities unless specifically excepted'" by the Wiretap Act.  *Kempf v. Kempf*, 868 F.2d at 973.

Based on the evidence of record, the court finds that there are no issues of material fact remaining on the plaintiff's federal Wiretap Act claims, and that the plaintiffs' federal Wiretap Act claims should be resolved as follows:

(a) Dianna Divingnzzo and Sam Divingnzzo are each liable to William Duane Lewton (individually), Adrianne Stang, Jennifer Holtberg, Rob Formanek, Rita Watson and Tammy Jones, under §§ 2511(1)(a) and (b) for intercepting the oral communications of all plaintiffs using the device planted in Little Bear, and  under §§ 2511(1)(c) & (d) for intentionally using and disclosing the plaintiffs' oral communications in conjunction with the state court Custody Case.

(b) William Bianco did not intercept the plaintiffs' oral communications and did not advise the Divingnzzos to do so; however, he is liable to William Duane Lewton, Adrianne Stang, Jennifer Holtberg, Rob Formanek, Rita Watson and Tammy Jones under §§ 2511(1)(c)

-23-

& (d) for intentionally using and disclosing the plaintiffs' oral communications to for the purpose of advancing Dianna Divingnzzo's position in the state court Custody Case.

(c) Christopher Perrone, and the law firm of Bianco Perrone & Stroh, LLC, did not violate the Wiretap Act in any respect.

### 2. Damages

Pursuant to 18 U.S.C. § 2520(c)(2), the court *may* assess as damages whichever is the greater of –

> (A) the sum of the actual damages suffered by the plaintiff and any profits made by the violator s a result of the violation; or
> (B) statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000.

"The $10,000 liquidated damages amount under § 2520(c)(2)(B) is designed to compensate a claimant for all of a transgressor's misdeeds under the Act, unless that transgressor has violated the Act on more than one hundred separate days, in which case compensation is $100 for each such day." *Smoot v. United Transp. Union*, 246 F.3d 633, 646 (6th Cir. 2001); *see also Bess v. Bess*, 929 F.2d 1332 (8th Cir. 1991). The decision to award statutory damages lies within the court's discretion. *See Morford v. City of Omaha*, 98 F.3d 398, 400-401 (8th Cir. 1996); *Reynolds v. Spears*, 93 F.3d 428, 435-36 (8th Cir. 1996).

The evidence shows that the recording device remained in the teddy bear from at least January 1, 2008 through June 3, 2008. Upon learning of Judge Arterburn's ruling, Dianna Divingnzzo destroyed the recording device with a sledgehammer. She and her father have also discarded or destroyed the computers they were using to store and transcribe the illegally intercepted communications. Dianna Divingnzzo chose the specific conversations she wished

-24-

to disclose, and there may have been even more illegally intercepted oral communications that the Divingnzzos chose not to disclose to Mr. Bianco. While it would seem that the Divingnzzos violated the Act on more than 100 separate days, there is no proof that they did so as to each plaintiff separately. Under the circumstances, and considering the totality of the Divingnzzos' conduct as reflected in the evidentiary record, the court finds that Dianna Divingnzzo and Sam Divingnzzo should each be held liable to each of the plaintiffs for statutory damages in the amount of $10,000 under the federal Wiretap Act.

The court has carefully considered Mr. Bianco's role in this matter and finds that damages should not be awarded against Mr. Bianco. Bianco did not solicit or advise the Divingnzzos to intercept the plaintiffs' oral communications. While he disclosed the illegally-obtained materials to advance his client's position in the Custody Case, the court did not consider the materials. The other recipients returned the materials unread or maintained the confidentiality of the communications.

### C. Plaintiffs' State Law Claims

Pursuant to 28 U.S.C. § 1331, this court has original federal question jurisdiction over plaintiffs' federal Wiretap Act claims. The court may exercise "supplemental jurisdiction" over claims that are "so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). The court may decline to exercise supplemental jurisdiction over such a claim if the claim raises a novel or complex issue of State law. 28 U.S.C. § 1367(c).

-25-

The events of this incident occurred in the context of a hotly contested child custody dispute. The federal courts customarily decline to intervene in the realm of domestic relations. *See Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 12 (2004).  Resolving the plaintiffs' state law tort claims, the corresponding common law defenses, and interpreting the Nebraska Telecommunications Consumer Privacy Protection Act  would require  the resolution of novel and complex issues of state law.  This court declines to exercise jurisdiction over the state law claims.

## ORDER

For the reasons discussed herein,

**IT IS ORDERED:**

1.  Divingnzzos' Amended Motion for Summary Judgment (Doc. 133) is denied.

2.  The attorney defendants' motion for summary judgment (Doc. 130) is granted as to Christopher Perrone and Bianco, Perrone & Stroh, LLC.

3.  Plaintiffs' Motion for partial summary judgment (Doc. 135) is granted as to the plaintiffs' claims under 18 U.S.C. § 2520(a).

(a) Pursuant to 18 U.S.C. § 2520(c)(2)(B), plaintiffs William Duane Lewton, Adrianne Stang, Jennifer Holtberg, Rob Formanek, Rita Watson and Tammy Jones are each awarded statutory damages of $10,000 as against defendant Dianna Divingnzzo.

(b) Pursuant to 18 U.S.C. § 2520(c)(2)(B), plaintiffs William Duane Lewton, Adrianne Stang, Jennifer Holtberg, Rob Formanek, Rita Watson and Tammy Jones are each awarded statutory damages of $10,000 as against defendant Sam M. Divingnzzo.

The court declines to award punitive damages under 18 U.S.C. § 2520(b)(2).

4.   Pursuant to 28 U.S.C. § 1367(c), this court declines to exercise Supplemental Jurisdiction over the plaintiffs' state law claims.  Plaintiffs' claims for violations of Neb. Rev. Stat. § 86-2,103 *et seq*., invasion of privacy, and mental suffering, are dismissed without prejudice to the plaintiffs seeking relief in state court.

5.   Plaintiffs' motion in limine (Doc. 115), Divingnzzos' Motion to Overrule Plaintiff's Objections to Subpoenas (Doc. 112) and plaintiffs' Motion to Compel and for Discovery Order (Doc. 156) are denied as moot.

6.   Pursuant to 18 U.S.C. § 2520(b)(3), the plaintiffs may recover "a reasonable attorney's fee and other litigation costs reasonably incurred" in the prosecution of their claims under the Federal Wiretap Act.  Accordingly, the plaintiffs are granted leave to file a Motion for Attorney Fees. Said motion shall be filed no later than **March 15, 2011** and shall comply with the requirements of NECivR 54.1, 54.3 and 54.4.  The defendants shall respond within the time allowed by NECivR 7.0.1(b)(1)(B).

7.   A separate judgment will be entered after the matter of attorney's fees is decided.

**DATED February 18, 2011.**

> **BY THE COURT:**
>
> **s/ F.A. Gossett, III**
> **United States Magistrate Judge**